# EXHIBIT A

**NEW YORK STATE SUPREME COURT**
**NEW YORK COUNTY**

-------------------------------------------------------------- X

KAJA SOKOLA,                    :

            Plaintiff,     :

                          :    **SUMMONS**

       v.                    :

                          :    Plaintiff designates

HARVEY WEINSTEIN, ROBERT WEINSTEIN, :    NEW YORK COUNTY

THE WALT DISNEY COMPANY, DISNEY        :    as the place of trial

ENTERPRISES, INC., MIRAMAX HOLDING     :

CORP., MIRAMAX FILM NY LLC f/k/a       :    The basis of the venue is:

MIRAMAX FILM CORP., and DOE CORP. 1-10, :    CPLR § 503(a)

                          :

                          :

            Defendants.    :

-------------------------------------------------------------- X

To the above-named Defendants:

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's attorney within twenty (20) days after service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: December 19, 2019
       New York, New York

                            WIGDOR LLP

           By:                                  

                   Douglas H. Wigdor
                   Bryan L. Arbeit
                   WIGDOR LLP
                   85 Fifth Avenue
                   New York, New York 10003
                   Telephone: (212) 257-6800
                   dwigdor@wigdorlaw.com
                   barbeit@wigdorlaw.com

THE LAW OFFICE OF KEVIN MINTZER, P.C.
Kevin Mintzer
1350 Broadway, Suite 1400
New York, New York 10018
Telephone: (646) 843-8180
km@mintzerfirm.com

*Attorneys for Plaintiff Kaja Sokola*

**NEW YORK STATE SUPREME COURT**
**NEW YORK COUNTY**

-------------------------------------------------------------X

KAJA SOKOLA,                                          :

                           Plaintiff,          :

                                          :          Index No. _____

             v.                              :

                                          :

HARVEY WEINSTEIN, ROBERT                      :
WEINSTEIN, THE WALT DISNEY                    :          **COMPLAINT**
COMPANY, DISNEY ENTERPRISES, INC.,            :
MIRAMAX HOLDING CORP., MIRAMAX                :
FILM NY LLC f/k/a MIRAMAX FILM CORP.,         :
and DOE CORP. 1-10,                            :          **Jury Trial Demanded**

                                          :

                          Defendants.         :

-------------------------------------------------------------X

       Plaintiff Kaja Sokola ("Plaintiff" or "Sokola") by her counsel, Wigdor LLP and The Law

Office of Kevin Mintzer, P.C., for her complaint against Harvey Weinstein, Robert Weinstein, The

Walt Disney Company, Disney Enterprises, Inc. (together with The Walt Disney Company,

"Disney"), Miramax Holding Corp., Miramax Film NY LLC f/k/a Miramax Film Corp. (together

with Miramax Holding Corp., "Miramax") and Doe Corp. 1-10 (collectively "Defendants"),

alleges as follows:

**PRELIMINARY STATEMENT**

       1.    This case illustrates the depth of Harvey Weinstein's depravity.  In 2002, Kaja

Sokola was a sixteen-year-old girl from Poland who had come to the United States to work as a

fashion model and to try to become an actress.  Soon after, she was introduced to Harvey Weinstein

at an event associated with her modeling agency.  Harvey Weinstein, co-head of the renowned

Miramax movie studio and employed by Disney, claimed that he was interested in helping Sokola

with her prospective acting career and wanted to meet with her for lunch.  Naïve as the child that she was, Sokola believed him.

2.      Several days later, Harvey Weinstein picked Sokola up with his company-provided car and driver.  But instead of taking her to lunch, as promised, Harvey Weinstein took Sokola without her consent to his apartment.  He would not let her leave until after he terrified and sexually abused her.  This traumatic day has been etched in Sokola's mind every day thereafter, and it has caused her immense emotional pain and suffering, even seventeen years later and long after she gave up her dreams of acting or working in the entertainment industry.

3.      Although Sokola did not know it at the time she was victimized, in the last two years, she and the rest of the world have learned that Harvey Weinstein did not act alone in sexually assaulting her and so many others.  Rather, he was supported by a large group of people who helped him to identify new potential victims, to cover up his misdeeds, and who looked away instead helping to protect the women – and in this case, the girl – who were in harm's way.

4.      Chief among Harvey Weinstein's enablers was his brother, Robert Weinstein, his longtime collaborator, business partner and co-head of Miramax.  Contrary to Robert Weinstein's current claims that he did not know about his brother's predatory behavior, the facts demonstrate that Robert Weinstein not only knew about it, but he affirmatively assisted Harvey Weinstein in paying off victims to silence them, ensuring that future victims had no way to protect themselves.

5.      Robert Weinstein was not alone.  Indeed, numerous employees and executives of Miramax and Disney were aware of Harvey Weinstein's pattern of misconduct, but the companies that employed him utterly failed to supervise him, and they continued to empower him with their prestige and resources and allowed him to find more victims, including Kaja Sokola.

2

6.     Were it not for the gross neglect of these individuals and companies and their failure to exercise reasonable care, Sokola would have been spared from Harvey Weinstein's predatory conduct.

7.     Despite the extensive record of Harvey Weinstein's repeated sexual misconduct and the negligence of his employers and enablers, until recently, Sokola could not have hoped for any justice or accountability for what Harvey Weinstein did to her to her when she was a child. The statute of limitations would have barred her claims, and she would be forced to accept the inadequate so-called "global settlement" that is being unfairly foisted upon so many other Weinstein victims.

8.     Fortunately, however, the New York legislature recently passed the Child Victims Act, which allows minor victims of sexual abuse such as Kaja Sokola to seek accountability against the people and entities that harmed them, even if those claims would have previously been time barred.

9.     Accordingly, Sokola files this case against the Defendants to obtain some measure of justice for the damage inflicted on her as a child.

## **PARTIES**

10.     Plaintiff Sokola is a 33-year-old woman.  She is a citizen and resident of Poland. Sokola graduated from the SWPS University of Social Sciences and Humanities with a Master of Science degree in psychology and currently works in Poland as a clinical psychologist and psychotherapist focusing on the treatment of eating disorders and additions.

11.     Defendant Harvey Weinstein is, on information and belief, a resident of New York and Connecticut.  He is a former co-chairman of Miramax and reported to Executives at Disney.

3

Miramax and Disney had the power to hire and fire Harvey Weinstein, set his pay and control his work conditions.

12.     Defendant Robert Weinstein is, on information and belief, a resident of California. Robert Weinstein is the brother of Harvey Weinstein and the former co-chairman of Miramax. Robert Weinstein has known of Harvey Weinstein's pattern and practice of predatory sexual conduct toward women, including during the time the brothers worked at Miramax.

13.     Defendant Miramax Holding Corp. is a Delaware Corporation with its principal place of business in Burbank, California.  On information and belief, Miramax Holding Corp. is a successor entity of one of the Miramax entities that employed Harvey Weinstein or for which Harvey Weinstein acted as an officer or director.

14.     Miramax Film NY, LLC is a New York corporation with its principal place of business in Santa Monica, California.  On information and belief, in 2010, Miramax Film NY, LLC merged with and assumed all liabilities of Miramax Film Corp., which was one of the Miramax entities that employed Harvey Weinstein or for which Harvey Weinstein acted as an officer or director.  Miramax Film Corp. at all relevant times herein was a subsidiary of The Walt Disney Company.  Miramax Holding Corp., Miramax Film NY, LLC and/or Miramax Film Corp are collectively referred to herein as "Miramax."

15.     Defendant The Walt Disney Company ("Disney") is a Delaware corporation with its principal place of business located in Burbank, California.  Miramax Film Corp., Disney and Harvey Weinstein entered into two employment agreements effective for the periods 1993 to 1995 and 1995 to 1999.[1]

---

[1]     *See Doe v. Weinstein*, 2018 ONSC 2122 (Can. Ont. S.C.J. Mar. 19, 2018), available at http://canlii.ca/t/hrg30.

4

Case 1:20-cv-00925-LJL   Document 1-1   Filed 02/03/20   Page 8 of 26

16.     On information and belief, Disney exercised oversight and control over Miramax and Harvey Weinstein, including, not limited to: paying Miramax's employees; controlling Miramax's budget; approving (or vetoing) requests for increased film budgets for Miramax; auditing Miramax's books; and reviewing, approving and paying the business expenses of Miramax.

17.     Defendant Disney Enterprises, Inc. ("Disney Enterprises") is a Delaware corporation with its principal place of business in Burbank, California.  Disney Enterprises and Miramax entered into a 1999 employment agreement with Harvey Weinstein, and Disney Enterprises agreed to be jointly and severally liable with Miramax from 1999 until the expiration of the employment agreement in or about 2005.[2]  The Walt Disney Company and Disney Enterprises, Inc. are referred to collectively herein as "Disney."

18.     Defendant Doe Corp. 1-10 are the unknown successor and related entities of Miramax and Disney that employed Harvey Weinstein during the relevant time period.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this matter pursuant to New York Civil Practice Laws and Rules ("CPLR") § 301.

20.     Venue is proper in New York County pursuant to CPLR § 503(a) because a substantial part of the events giving rise to the claim occurred in New York County.

21.     Plaintiff, proceeding as Jane Doe, originally filed some of the claims asserted herein as a named class representative in the purported class action entitled *Geiss, et al. v. The Weinstein Company Holdings et al.*, No. 17 Civ. 09554 in the United States District Court for the Southern

---

[2]     *See Doe v. Weinstein*, 2018 ONSC 2122 (Can. Ont. S.C.J. Mar. 19, 2018), available at http://canlii.ca/t/hrg30.

District of New York ("*Geiss*"). By Order and Opinion signed on April 17, 2019, the Court in

*Geiss* dismissed Plaintiff's claims without prejudice until they could be timely refiled under CPLR

§ 214-g, which was adopted as part of the Child Victims Act. This Complaint is filed consistently

with the *Geiss* Court's April 17, 2019 Order and Opinion.

## FACTS

### Background Regarding the Weinstein Brothers and Miramax

22. In the late 1970s, brothers Harvey and Robert Weinstein created a small

independent film-distribution company named Miramax.

23. Throughout the 1980s, Harvey and Robert Weinstein grew in prominence in the

film industry as Miramax produced and distributed films that achieved both critical attention and

commercial success.

24. In 1993, after the success of the motion picture *The Crying Game*, Disney

purchased Miramax from Harvey and Robert Weinstein in a deal valued between $60 to $80

million.

25. The next year, Miramax released its first blockbuster, Quentin Tarantino's *Pulp

Fiction*, and distributed the popular independent film *Clerks*.

26. Miramax won its first Academy Award for Best Picture in 1997 with the victory of

*The English Patient*. In the following years, Miramax produced many highly successful films,

including *Good Will Hunting* and *Shakespeare in Love*, both of which won many Academy

Awards.

27. By 2002, Harvey and Robert Weinstein had become enormously powerful and

influential producers in the film and television industry.

6

28.     By 2002, Harvey Weinstein had also developed a propensity for sexually harassing, sexually assaulting, and/or attempting to sexual assault women who worked or were seeking to work in the film industry.

29.     Using the power, influence and resources of his position at Miramax, Harvey Weinstein often met privately with women who were seeking acting roles in Miramax productions. During many of these meetings, which were supposed to be for business purposes, Harvey Weinstein sought sexual contact with the women whom he had induced to see him, using promises of career assistance, threats of career destruction and physical force to overcome the resistance of women who did not wish to have sexual contact with him.

**Harvey Weinstein's Sexual Abuse of Kaja Sokola**

30.     In or about September 2002, 16-year-old Kaja Sokola was attending an event in Manhattan associated with her modeling agency.  Less than a month prior, Sokola had moved to the United States from Poland with dreams of becoming an actress.  She was living for the first time without her parents, and she had never before lived outside of Poland.  She was young, naïve and impressionable.

31.     At the event with her modeling agency, Sokola met Harvey Weinstein, who she learned was a producer.  When Weinstein, then 50 years old, learned Sokola was interested in becoming an actress, he gave her his card and directed her to give him her phone number.  He told Sokola that they would have lunch to discuss her future.

32.     This is a family picture of Sokola taken when she was 17, approximately one year *older* than when she met Harvey Weinstein:



33.     Sokola was amazed and excited that an important American film producer was interested in her future. It never occurred to her that his intentions towards her were anything other than professional and honorable.

34.     Approximately three days later, Harvey Weinstein called to inform Sokola that he would pick her up with his driver for lunch. Sokola understood that the lunch with Harvey Weinstein would be for business purposes and to discuss her career, including opportunities for roles on Miramax projects.

35.     On information and belief, in arranging the meeting and picking up Sokola, Weinstein used a phone, car and driver that were paid for or owned by Miramax and/or Disney so that he could conduct the business of those companies.

36.     In the car, Harvey Weinstein asked Sokola where she was from and how old she was. She replied that she was sixteen and was from Poland.

37.     Instead of taking them to a restaurant, Harvey Weinstein's driver dropped the two at Harvey Weinstein's Soho apartment. Sokola had not agreed to go there, but she was given no choice.

8

38. As Sokola rode the elevator with him in his building, she became nervous. When the elevator door opened directly into Harvey Weinstein's apartment, Sokola realized that they were completely alone.

39. Once alone with Sokola, Harvey Weinstein wasted no time in aggressively and threateningly demanding sex. He told her that if she wanted to be an actress, she would have to be comfortable doing whatever the director told her to do—including losing her inhibitions and getting naked. He then instructed Sokola to take off her clothes. Terrified, Sokola followed his instructions and took off her blouse and unzipped her jeans. Sokola felt as though she was no longer in control of her body.

40. Weinstein took Sokola's hand and placed it on her vagina, instructing her to touch herself. He also touched Sokola vagina.

41. Terrified and struggling to hold back tears, Sokola said she did not want to do anything further and resisted his demands. Sokola had no intention or understanding when she agreed to a business lunch that she would be put in this position.

42. Harvey Weinstein threatened and pressured Sokola, saying that he had "made" the careers of Penelope Cruz and Gwyneth Paltrow, and that neither would be working without him. He intimated that Sokola would never work as an actress unless she acquiesced to his demands.

43. Harvey Weinstein then took off his pants and forcibly held Sokola while taking her hand and making her touch and massage his penis while he grabbed at her breasts.

44. As Harvey Weinstein forcibly caused her to touch him, Sokola continuously protested. However, Harvey Weinstein's demeanor became intense, as if he was hunting prey. Sokola realized then he was determined to sexually satisfy himself with her in whatever way he wanted.

9

45.    Weinstein eventually ejaculated on the floor.

46.    Overwhelmed by fear and emotion, Sokola tried to leave the apartment, but she could not get out because Weinstein was blocking the door, holding her arms and yelling at her to calm down. Weinstein insisted that what had just happened was normal. Sokola began to scream at Harvey Weinstein, telling him that she did not want to touch him or do what he wanted of her. Harvey Weinstein returned Sokola's shouting with anger, which made her even more scared. Sokola realized that she would have to calm down and be quiet if she would have any chance of escaping from Weinstein without being harmed even more.

47.    Throughout the incident, Sokola berated herself. She felt angry at Harvey Weinstein's demands, and ashamed that he was causing her to unwillingly engage in sex acts. Harvey Weinstein made clear that refusing his sexual demands would mean giving up the opportunity to make it in Hollywood.

48.    As Harvey Weinstein finally let Sokola leave, he told her that she needed to work on her stubbornness.

49.    Approximately one week after the incident at his apartment, Harvey Weinstein called Sokola to ask how she was doing. She had spent the week worrying that she had destroyed her life and career by refusing to passively go along with Weinstein's wishes.

50.    Harvey Weinstein thereafter persisted in his pursuits against Sokola and took every opportunity to make sure that she understood that he was the only person who could help her become an actress. Based on what happened in Harvey Weinstein's apartment, Sokola experienced fear and anxiety whenever she communicated with him.

51.    Harvey Weinstein's ongoing emotional abuse, and the guilt, shame and anxiety that flowed from the 2002 incident—when she was 16 and alone with Harvey Weinstein—took a toll

10

on Sokola, including long term depression, anorexia and difficulty in maintaining healthy relationships with men.

52.     Harvey Weinstein should never have been in a position to sexually abuse Sokola. In fact, Sokola only experienced this trauma because numerous individuals, including Robert Weinstein and other high level officers and directors of Miramax and Disney, affirmatively enabled Harvey Weinstein's continuing sexual misconduct and looked the other way when they learned of repeated prior instances of Harvey Weinstein sexually harassing and sexually assaulting women he encountered in working for Miramax and Disney.

**<u>Robert Weinstein's Knowledge and Concealment of Harvey Weinstein's Sexual Misconduct</u>**

53.     At Miramax, Robert Weinstein, who ran the company with his brother, knew that Harvey Weinstein engaged in a pattern of sexual misconduct.  Robert Weinstein not only failed to do anything to stop his brother, he repeatedly helped Harvey Weinstein conceal his misconduct and claim new victims.

54.     Robert Weinstein's assistant at Miramax in the early 1990s, Kathy DeClesis, told the *New York Times* that Harvey Weinstein's harassment of women "wasn't a secret to the inner circle," which included Robert Weinstein.[3]

55.     DeClesis also supervised a young woman who left the company abruptly after an encounter with Harvey Weinstein, and that young woman later received a settlement.[4]

---

[3]     Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, The New York Times (Oct. 5, 2017), https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html (last accessed December 18, 2019).

[4]     *Id.*

11

56.    Robert Weinstein personally knew the circumstances that caused this young woman's abrupt departure because DeClesis handed Robert Weinstein a letter from the young woman's lawyer, telling him that, "Your brother is a pig."[5]

57.    In 1998, Robert Weinstein personally paid £250,000 to settle claims asserting that Harvey Weinstein had sexually harassed and/or attempted to rape two female employees of Miramax.

58.    Zelda Perkins, who had been Harvey Weinstein's assistant at Miramax, claimed that Harvey Weinstein had repeatedly sexually harassed her by, among other behavior, walking around naked when they were together in his hotel suite, asking her to give him massages, and trying to pull her into bed with him.[6]

59.    Rowena Chiu, also a former assistant of Harvey Weinstein, alleged that Harvey Weinstein, while they were together in his hotel suite at the Venice Film Festival, had made a series of sexual requests to her, which she rejected, and that he then forcibly massaged her legs, took off her tights, and held her on the bed, telling her it would all be over with one thrust. She managed to escape right before she was raped.[7]

60.    Both Perkins and Chiu, as a condition of their settlements with the Miramax Film Corp., were forced to sign a strict confidentiality agreement.  The settlement agreement explicitly

---

[5]    Halle Kiefer, *Bob Weinstein's Former Assistant Says She Told Him About His Brother Harvey's Sexual Harassment Over 25 Years Ago,* Vulture.com (Oct. 20, 2017), https://www.vulture.com/2017/10/bob-weinstein-ex-assistant-he-knew-about-harvey-decades-ago.html (last accessed December 18, 2019).

[6]    Matthew Garrahan, *Harvey Weinstein: How lawyers kept a lid on sexual harassment claims*, Financial Times (Oct. 23, 2017), https://on.ft.com/2NFpcdh (last accessed December 18, 2019).

[7]    Rowena Chiu, *Harvey Weinstein Told Me He Likes Chinese Girls*, New York Times (Oct. 5 2019), https://www.nytimes.com/2019/10/05/opinion/sunday/harvey-weinstein-rowena-chiu.html (last accessed December 18, 2019).

12

lists Robert Weinstein, Harvey Weinstein and Miramax Film Corp. among the parties being released, and it provides that only Robert Weinstein or Harvey Weinstein could consent to the release of confidential information covered by the settlement agreement.[8]

61.     As part of the settlement agreement with Perkins, Harvey Weinstein agreed to attend therapy, and Miramax was required to dismiss Harvey Weinstein if there were any further complaints (although it never did despite additional subsequent complaints).  The settlement agreement also required that Miramax establish a proper complaint procedure for future complaints.

62.     Despite the fact that Robert Weinstein and others at Miramax were aware of the allegations made by Perkins and Chiu against Harvey Weinstein, no investigation was conducted, and no discipline was imposed on Harvey Weinstein.

63.     According to the *New York Times*, Robert Weinstein also participated in settling another sexual assault allegation made against Harvey Weinstein in 1990 by another of his assistants.[9]

64.     In addition to the above, Robert Weinstein knew or should have known that his brother was a danger to sexually assault Kaja Sokola given that Robert Weinstein:

a.      witnessed his brother's physically and verbally abusive behavior;

b.      attended meetings with Harvey and other Miramax executives and employees while Harvey was wearing only a bathrobe or underwear;

---

[8]    Excerpts of the agreements were submitted to the Women and Equalities Committee of the U.K. Parliament and can be found at https://www.parliament.uk/documents/commons-committees/women-and-equalities/Correspondence/Zelda-Perkins-SHW0058.pdf (last accessed December 18, 2019).

[9]    Megan Twohey et al., *Weinstein's Complicity Machine*, The New York Times (Dec. 5, 2017), https://www.nytimes.com/interactive/2017/12/05/us/harvey-weinstein-complicity.html   (last accessed December 18, 2019)

13

c.   received direct and indirect verbal and written complaints made by and on behalf of female victims who were sexually assaulted by Harvey Weinstein; and

d.   knew of and authorized Miramax to make payments to settle claims by women who were sexually assaulted by Weinstein.

65.   Robert Weinstein knew that Harvey Weinstein's pattern of assault was a problem, but he deliberately chose to cover it up and pretend it did not happen.

66.   For example, when Robert Weinstein dated Ivana Lowell, who was the Vice President of the book division at Miramax in the 1990s, Robert Weinstein asked her if she had slept with his brother, and she responded "no, but not for want of him aggressively trying, and all the other women…," at which point Robert cut her off and said: "No, I don't want to know."[10]

**Disney and Miramax's Knowledge of Harvey Weinstein's Propensity to Engage in Sexual Harassment and Sexual Assault**

67.   In addition to Robert Weinstein, many other executives at Miramax and/or Disney were aware of Harvey Weinstein's propensity to sexually harass and sexually assault women with whom he was meeting while conducting business for Miramax.

68.   Irwin Reiter, the Executive Vice President of Accounting and Financial Reporting for Miramax from 1989 to 2005, has admitted that Weinstein's "mistreatment of women" was an ongoing problem.

69.   Reiter discussed Harvey Weinstein's pattern of sexual harassment and assaults of women with other officers within Miramax, including Robert Weinstein.

70.   Reiter reviewed and handled payments to Harvey Weinstein's victims from Miramax funds, as well as caused Disney to contribute to such payments directly or indirectly.

---

[10]   *Former Miramax Executive Describes Working for Harvey Weinstein as a "Madhouse"*, Inside Edition (October 17, 2017), available at https://www.youtube.com/watch?v=ULejo9adUqg (last accessed December 18, 2019).

71.     Despite his extensive knowledge, Reiter failed to cause any independent investigations to be undertaken or take any actions to prevent or diminish the likelihood of further assaults.

72.     Mark Gill was head of marketing from approximately 1994 to 1997 in Miramax's New York office. He then was the President of Miramax's Los Angeles division from approximately 1997 to 2002.

73.     Gill told *The New York Times* that, behind the scenes at Miramax, Weinstein's treatment of women "was the biggest mess of all."

74.      Gill's knowledge came from witnessing Weinstein sexually inappropriate and harassing behavior.  Gill also received direct complaints from women after assaults or harassment occurred.

75.     Despite his extensive knowledge, Gill failed to cause any independent investigations to be undertaken or take any actions to prevent or diminish the likelihood of further assaults.

76.     Miramax officer Barbara Schneeweiss knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women with whom he was meeting with on Miramax business.

77.     Schneeweiss worked at Miramax from 1996-2005.  Schneeweiss regularly brought young actresses to Harvey Weinstein, under the guise of a legitimate business meeting, who would then be sexually harassed or assaulted by Weinstein.

78.     Based on her interactions with these victims and Harvey Weinstein, Schneeweiss knew or should have known that Harvey Weinstein was engaging in sexual misconduct and abuse,

Case 1:20-cv-00925-LJL Document 1-1 Filed 02/03/20 Page 19 of 26

but she failed to take any action to have Harvey Weinstein investigated or to diminish the likelihood of further assaults.

79.     Miramax officer Rick Schwartz knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women with whom he was meeting with on Miramax business.

80.     As the Senior Vice President of Production at Miramax from 1999 to 2006, Schwartz had direct knowledge and facilitated assaults by Harvey Weinstein, including Weinstein's alleged attempted sexual assault in 1998 on Zoe Brock, who, like Sokola, was a model who sought to work as an actress.

81.     Schwartz was regularly tasked with luring victims to Weinstein's hotel suites. Sometimes Schwartz would lead the women up to Weinstein's hotel suite to give the meeting an air of legitimacy. Schwartz would then leave the meeting or ensure that the victim was left alone with Weinstein while the assault occurred.

82.     Schwartz was also regularly tasked with taking care of the victims after the assaults occurred. After Schwartz learned about what happened to Zoe Brock, Schwartz apologized for Weinstein's behavior, admitting that it had happened before.

83.     Despite his extensive knowledge, Schwartz failed to cause any independent investigations to be undertaken or take any actions to prevent or diminish the likelihood of further assaults – but rather continued to facilitate the assaults throughout his tenure at Miramax.

84.     Miramax officer Nancy Ashbrooke knew or should have known that Harvey Weinstein was regularly sexually assaulting, battering, harassing and threatening women.

85.    As the Vice President of Human Resources for Miramax from 1991 to 2000, Ashbrooke had direct knowledge of complaints regarding Weinstein's sexual misconduct and directly witnessed Harvey Weinstein's sexual harassment of women.

86.    Ashbrooke was responsible for the human resources department at Miramax, where numerous complaints of sexual misconduct and assault against Harvey Weinstein were not properly handled, including the Zelda Perkins and Rowena Chiu complaints discussed above.

87.    Despite Miramax's corporate knowledge of the Perkins and Chiu settlement agreement with Miramax, Ashbrooke did not take any action or implement any of the required terms of the settlement that could have prevented additional sexual assaults by Harvey Weinstein. Nor did Ashbrooke or Miramax take any action against Harvey Weinstein when they learned of additional complaints about Harvey's conduct.

88.    Disney employed and paid the salaries of many of the people who performed work for Miramax and who helped facilitate Harvey Weinstein's pattern of assaults.

89.    As discussed above, Harvey Weinstein initially entered into two employment agreements to which both Miramax and The Walt Disney Company were signatories, the first of which was effective from in or about 1993-1995 and the second from 1995-1999. Harvey Weinstein's third employment agreement, to which Disney Enterprises and Miramax were signatories and pursuant to which Disney Enterprises was jointly and severally liable with Miramax, was effective from 1999 until in or about 2005.

90.    While at Miramax, Harvey Weinstein reported directly to Michael Eisner, who was Disney's Chief Executive Officer. Eisner delegated oversight of Harvey Weinstein to a series of Disney executives who did not adequately supervise him. While Eisner originally delegated oversight to Jeffrey Katzenberg, the Chairman of Disney, Katzenberg delegated oversight of the

17

Weinstein brothers in 1994 to a marketing and distribution executive Dick Cook, who could not control the brothers. After just a few months, Katzenberg put Bill Mechanic, then head of Disney's international and worldwide video division, in charge of Miramax. Mechanic quickly identified that Miramax did not follow the law in its human resources practices.

91.     After Mechanic left Disney in the fall of 1994, Eisner assigned Joe Roth to oversee Miramax and Harvey Weinstein. Roth found himself "putting out fires the brothers had started," including with talent agents and talent agencies who the Weinsteins were always battering to, inter alia, "get somebody off of a picture, deliver a client, whatever the issue was."[11] These issues included Harvey Weinstein's sexual harassment of women. And, despite the fact that Roth was actively overseeing them, Harvey and Robert Weinstein nonetheless "always wanted to go directly to Michael [Eisner]."[12]

92.     Eisner thus did not permit Miramax to be completely autonomous and had knowledge not only of financial matters, but also Harvey Weinstein's pattern of misconduct toward women.

93.     Harvey Weinstein's executive assistant Barbara Schneeweiss was jointly employed by Miramax and Disney. According to Schneeweiss, Disney paid Miramax's employees, controlled Miramax's budget, approved (or vetoed) Miramax's requests for increased film budgets, audited Miramax's books, and reviewed, approved (or rejected), and paid for Miramax's business expenses.

94.     During the time Disney owned Miramax, Miramax paid settlements to multiple women who were victims of Harvey Weinstein's sexual harassment and abuse. Based on Disney's

---

[11]     Peter Biskind, *Down and Dirty Pictures* (2004), at 198.

[12]     *Id.*

18

control of Miramax finances, Disney knew or should have known of these payments, which should have caused additional inquiry and investigation.

94.    Moreover, given that Eisner had assigned eyes and ears from Disney to watch over Harvey Weinstein – and those persons had knowledge of Harvey Weinstein's conduct, Eisner and Disney knew or should have known of Harvey Weinstein's sexual harassment and abuse.

95.    Instead of taking action, including but not limited to an independent investigation of Weinstein's conduct and/or the implementation of controls to prevent further abuse and/or the termination of Weinstein, Eisner and Disney chose to publicly misrepresent that they did not have the right to exercise control over Weinstein.  In fact, every corporation has the duty to oversee and supervise its employees; it is not a duty that can be contractually waived.

**Timeliness Under the Child Victims Act**

97.    This action is timely because it falls within CPLR 214-g and is brought during the one-year time period set forth in that section. The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological and other injury suffered as a result of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law, and such acts and/or omissions were committed against Kaja Sokola when she was less than eighteen years of age.

98.    Specifically, the conduct that gives rise to Kaja Sokola's claims herein would constitute a violation of, *inter alia*, New York Penal Law, 130.52 (forcible touching), 130.55 (sexual abuse in the third degree) and 130.65 (sexual abuse in the first degree) (collectively, the "Child Sex Crimes").

19

Case 1:20-cv-00925-LJL    Document 1-1    Filed 02/03/20    Page 23 of 26

## FIRST CAUSE OF ACTION
### (Battery)
### *Against Harvey Weinstein*

99.     Plaintiff repeats and realleges paragraphs 1-96 as if fully set forth herein.

100.    In performing the Child Sex Crimes described above, Defendant Harvey Weinstein committed a battery against Plaintiff because he intentionally engaged in unlawful, intentional and offensive touching or application of force to Plaintiff's person.

101.    As a result of Harvey Weinstein's alleged conduct Sokola has suffered physical injury, severe emotional distress, humiliation, embarrassment, anxiety, economic harm and other consequential damages.

102.    The conduct of Harvey Weinstein described above was willful, wanton and malicious.  At all relevant times, Harvey Weinstein acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from Harvey Weinstein according to proof at trial.

## SECOND CAUSE OF ACTION
### (Negligence)
### *Against Miramax, Disney and Robert Weinstein*

103.    Plaintiff repeats and realleges paragraphs 1-100 as if fully set forth herein.

104.    Miramax, Disney and Robert Weinstein's conduct described herein, including the negligent retention and/or supervision of Harvey Weinstein and affirmative acts covering up and empowering Harvey Weinstein to commit sexual assaults, resulted in Harvey Weinstein's commission of the Child Sex Crimes against Plaintiff.

20

105. Based on prior complaints against Harvey Weinstein, Miramax and Disney knew or reasonably should have known that Harvey Weinstein had a propensity to engage in sexual misconduct and would use his position with Miramax to lure Plaintiff and other similarly situated female aspiring actresses to his apartment under the guise of discussing business opportunities to sexually harass, batter and assault them.

106. Robert Weinstein's prior acts of covering up for Harvey Weinstein's sexual misconduct with women with whom he worked created a continuing risk of Harvey Weinstein engaging in similar sexual misconduct, but Robert Weinstein nonetheless allowed Harvey Weinstein to have the authority and resources to engage in sexual misconduct with female employees and actresses and knew Harvey Weinstein continued to engage in sexual misconduct and/or that Harvey Weinstein had the temptation or opportunity to engage in sexual misconduct.

107. Miramax, Disney and Robert Weinstein had a duty of care to properly hire, train, retain, supervise and discipline their employees to avoid unreasonable harm to others or to take steps to alleviate harm caused by one's affirmative conduct.

108. Miramax, Disney and Robert Weinstein breached their duty of care by way of their own conduct as alleged herein, including, but not limited to, terminating Harvey Weinstein's employment or taking steps to warn or otherwise reduce the risk that Harvey Weinstein would use his position of power to continue to engage in sexual misconduct with female employees and actresses.

109. The burden on Miramax, Disney and Robert Weinstein to take some action to warn or otherwise reduce the risk of Harvey Weinstein's sexual misconduct was slight, while the harm from Harvey Weinstein's sexual misconduct was grave and caused significant physical and mental harm on often naïve and vulnerable female employees and aspiring actresses.

21

110.     Miramax, Disney and Robert Weinstein's negligent and/or affirmative conduct in relation to Harvey Weinstein's propensity to engage in sexual misconduct was a substantial factor in causing Plaintiff's harm.

111.     As a direct and proximate result of Miramax, Disney and Robert Weinstein's negligent and/or affirmative conduct, as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, and economic harm.

112.     The conduct described above by Miramax, Disney and Robert Weinstein was willful, wanton and malicious. At all relevant times, Miramax, Disney and Robert Weinstein acted with conscious disregard of Plaintiff's rights and feelings and also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiff and other similarly situated aspiring actresses.  By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from Miramax, Disney and Robert Weinstein according to proof at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays judgment be entered in her favor against Defendants, and each of them, as follows:

1.     For a money judgment representing compensatory damages including consequential damages, lost wages, earning, and all other sums of money, together with interest on these amounts, according to proof;

2.     For an award of money judgment for mental pain and anguish and severe emotional distress, according to proof;

3.     For punitive and exemplary damages according to proof;

22

4.       For attorneys' fees and costs as provided by statute;

5.       For prejudgment and post-judgment interest; and

6.       For such other and further relief as the Court may deem just and proper.

Dated: December 19, 2019
      New York, New York

WIGDOR LLP


By: _____
      Douglas H. Wigdor
      Bryan L. Arbeit
      WIGDOR LLP
      85 Fifth Avenue
      New York, New York 10003
      Telephone: (212) 257-6800
      dwigdor@wigdorlaw.com
      barbeit@wigdorlaw.com

      THE LAW OFFICE OF KEVIN MINTZER, P.C.
      Kevin Mintzer
      1350 Broadway, Suite 1400
      New York, New York 10018
      Telephone: (646) 843-8180
      km@mintzerfirm.com

      *Attorneys for Plaintiff Kaja Sokola*

23